**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KAISHA MOSS,<br><br>          Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | Civil Action No. 13-3365 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge.

Before the Court is Plaintiff Kaisha Moss ("Plaintiff")'s appeal, which seeks review of Administrative Law Judge ("ALJ") April M. Wexler's denial of her application for supplemental security income. The Court resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons set forth below, the Court vacates the final decision of the Commissioner of Social Security and remands for further administrative proceedings.

## I.     BACKGROUND

### A.     Plaintiff's Work History, Activities of Daily Living, and Exertional Limitations

Plaintiff was born on July 2, 1976, and has an eleventh grade education. (R. at 38-39).[1] She has worked as a chef, cashier, waitress, and bartender—jobs which generally required her to stand throughout the workday and to lift boxes. (*Id.* at 40-44). With regard to her activities of daily living, according to Plaintiff, she lives alone in a third floor walk-up apartment where she watches television, reads, and cooks during the day. (*Id.* at 38, 157-58). Though she usually

---

[1] "R." refers to the pages of the Administrative Record.

receives assistance from her friends and family, Plaintiff maintains that she is able to dust, sweep, wash dishes, and make her bed. (*Id.* at 157). At the November 2011 administrative hearing, Plaintiff testified that she shops for groceries with the assistance of her father, goes to bars and/or restaurants two to three times per month, and attends sporadic family functions. (*Id.* at 48-50). She further testified that she occasionally uses public transportation and that, when necessary, she walks to the store around the corner or to the pharmacy up the street from her apartment. (*Id.* at 50).

With regard to her exertional limitations, Plaintiff reported in November 2009 that she could lift only fifteen to twenty pounds and walk only one block before needing to rest for fifteen to twenty minutes. (*Id.* at 159). In August 2010, she reported that she has difficulty sleeping through the night because of her back and leg pain. (*Id.* at 168). In November 2011, she testified that it is painful for her to sit and stand for long periods of time. (*Id.* at 44). When she stands, Plaintiff testified that she can only do so for about fifteen minutes if she uses her cane, which her doctor prescribed her. (*Id.* at 50-51). When she sits, Plaintiff testified that she must periodically stand to stretch her legs and back. (*Id.* at 44).

B.      Plaintiff's Medical History

Plaintiff alleges that she suffers from (1) degenerative disc disease, (2) obesity, (3) knee pain, (4) anemia, (5) depression, and (6) hypertension. A discussion of the evidence pertaining to each of these impairments follows.

1.      Plaintiff's Degenerative Disc Disease

Plaintiff has degenerative disc disease. In June 2008, Plaintiff was involved in a car accident. (*Id.* at 215). Shortly thereafter, she began receiving treatment for neck and back pain. (*Id.*). In September 2008, Dr. Natalio Damien performed an MRI on Plaintiff's lumbar and

2

cervical spines. (*Id.* at 197-98). The former revealed moderate spinal stenosis at the L4/5 disc and central disc herniations at the L2/3, L3/4, and L4/5 levels, which impressed on the anterior thecal sac and narrowed the lateral recesses at those levels. (*Id.* at 198). The latter revealed mild disc bulging at the C3/4 and C6/7 levels, as well as a central and left-sided subligamentous disc herniation at the C5/6 level, which moderately impressed on the anterior thecal sac. (*Id.* at 197).

On December 3, 2008, Dr. Edwin M. Gangemi of Jersey Rehab and Pain Management examined Plaintiff. (*Id.* at 199). At the time, Plaintiff complained of constant neck and back pain, as well as numbness and tingling in her bilateral upper extremities. (*Id.*). Dr. Gangemi's examination revealed tenderness and decreased movement in Plaintiff's neck and lumbar spine, as well as diminished sensation in her right C5 and left L4 and L5 dermatomes. (*Id.* at 200). Dr. Gangemi's examination further revealed that Plaintiff was in "mild discomfort" and walked with a slightly forward flexed gait. (*Id.*). Dr. Gangemi recommended chiropractic care and prescribed Plaintiff Lidoderm, Ultracet, and Amrix. (*Id.*).

On December 5, 2008, Dr. Francis A. Pflum, an orthopedic surgeon, examined Plaintiff. (*Id.* at 215-17). Dr. Pflum's examination of Plaintiff's lumbar spine revealed tenderness to palpation with a marked decrease in range of motion. (*Id.* at 216). Dr. Pflum's examination of her cervical spine revealed tenderness and a fair range of motion. (*Id.*).

Plaintiff visited Dr. Shailendra Hajela, also of Jersey Rehab and Pain Management, on December 31, 2008. (*Id.* at 201-02). She complained of discomfort in the neck and lower back and continued numbness and tingling in her bilateral upper extremities. (*Id.* at 201). Dr. Hajela's examination once again revealed tenderness and decreased movement in Plaintiff's neck and back, as well as diminished sensation in her right C5 and left L4 and L5 dermatomes. (*Id.*). Dr. Hajela noted that the medication he prescribed seemed to be helping Plaintiff. (*Id.*).

In January 2009, Plaintiff returned to Dr. Gangemi, complaining of pain in her lower back that radiated to her legs and feet. (*Id*. at 203). Plaintiff indicated that sitting and walking aggravated her symptoms. (*Id*.). Dr. Gangemi reported that Plaintiff had undergone physical therapy with mild improvement. (*Id*.). He observed evidence of mild sensori-motor axonal and demyelinating peripheral neuropathy in Plaintiff's lower extremities; he also observed bilateral L4-L5 radiculopathies. (*Id*. at 204). At the time, Dr. Gangemi injected Plaintiff's spine with lidocaine, which provided her with "immediate relief." (*Id*.).

In February 2009, Plaintiff visited Dr. Hajela. (*Id*. at 209-14). Plaintiff again complained of neck pain, noting that sitting and standing worsened these symptoms. (*Id*. at 209). Dr. Hajela performed an electrodiagnostic evaluation, which revealed left C5 and C6 irritation of the posterior primary rami. (*Id*. at 210). Dr. Hajela noted that these findings did not meet the "strict criteria" for cervical radiculopathy. (*Id*.).

On March 14, 2009, Plaintiff was involved in a second car accident. (*Id*. at 220). Shortly thereafter, on March 20, 2009, Plaintiff returned to Dr. Pflum, complaining of increased pain in her neck and lower back. (*Id*.). Plaintiff claimed that her neck pain radiated down the left upper extremity with pain in her left forearm and elbow. (*Id*.).

In May 2010, Dr. Betty Vekhnis performed a physical consultative examination of Plaintiff. (*Id*. at 223-26). Plaintiff complained of lower back pain, which she rated as a nine out of ten on a pain index, and pain between her shoulder blades. (*Id*. at 223). Dr. Vekhnis observed that Plaintiff walked with a normal gait, did not use an assistive device for ambulation, could walk on her heels and toes, and could squat. (*Id*. at 223-24). While Dr. Vekhnis's examination of Plaintiff's cervical spine did not reveal vertebral tenderness, paraspinal muscle spasms, or any limitations to her range of motion, it did reveal a midline upper thoracic spine large lipoma.

(*Id.*). Dr. Vekhnis's examination of Plaintiff's lumbar spine revealed no vertebral tenderness, diffuse paraspinal muscle tenderness, or skin fold asymmetry. (*Id.*). However, said examination revealed limited range of motion in Plaintiff's lumbar spine and a positive straight-leg raising test in the supine position. (*Id.*). Dr. Vekhnis's examination of Plaintiff's upper extremities showed "non-tender range" in her shoulders, elbows, wrists, and hands, with normal muscle strength. (*Id.* at 224).

In June 2010, state agency consultant Dr. James Paolini completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (*Id.* at 227-34). With regard to exertional limitations, Dr. Paolini concluded that Plaintiff could: frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; and push and/or pull in a limited fashion. (*Id.* at 228). With regard to postural limitations, Dr. Paolini concluded that although Plaintiff could never crawl, crouch, nor climb ladders, ropes, or scaffolds, she could occasionally kneel, stoop, balance, and climb ramps or stairs. (*Id.* at 229). With regard to manipulative limitations, Dr. Paolini concluded that Plaintiff had a limited ability to reach in all directions. (*Id.* at 230).

In October 2010, Dr. Pflum diagnosed Plaintiff with cervical and lumbar intervertebral disc herniations. (*Id.* at 241). Dr. Pflum listed June 22, 2008 as the onset date of Plaintiff's conditions and indicated that she has limitations in her ability to walk, stoop, climb, bend, and lift. (*Id.* at 242). Dr. Pflum opined that Plaintiff was unable to work and would be unable to do so for a period of twelve months or more. (*Id.*).

From May 2011 through October 2011, Dr. Mirela Feurdean treated Plaintiff for various medical issues, including, but not limited to,[2] her neck and back pain. (*Id*. at 257). In May 2011, Dr. Feurdean noted that Plaintiff complained of chronic neck and back aches related to her motor vehicle accidents and that she walked with a limp. (*Id*. at 257-258). Dr. Feurdean advised Plaintiff to take Tylenol, to use a muscle relaxant, and to apply a hot compress to treat her neck and back pain. (*Id*. at 257).

In September 2011, Dr. Feurdean prepared a physical RFC questionnaire concerning Plaintiff. (*Id*. at 250-54). Dr. Feurdean noted therein that she had diagnosed Plaintiff with, among other conditions, herniated discs at the L2-L5 levels. (*Id*. at 250). Dr. Feurdean also noted that standing and/or walking increased Plaintiff's pain, but that her use of Flexeril, a muscle relaxant, decreased such pain. (*Id*.). With regard to exertional limitations, Dr. Feurdean opined that Plaintiff could: never lift and carry less than ten pounds in a competitive work situation; sit for ten minutes at a time before needing to stand; stand for ten minutes at a time before needing to sit; and stand and/or walk for less than two hours total in an eight-hour workday. (*Id*. at 251-252). Dr. Feurdean further opined that any job obtained by Plaintiff must permit her to shift positions at will from sitting, standing, or walking. (*Id*. at 252). With regard to postural limitations, Dr. Feurdean opined that Plaintiff could never twist, stoop, crouch, squat, nor climb ropes, ladders, or stairs. (*Id*. at 253). Lastly, Dr. Feurdean opined that Plaintiff's impairments would likely cause her to miss more than four days of work per month. (*Id*. at 253).

At the November 2011 administrative hearing, Plaintiff testified that she takes Tylenol, hydrocodone, and Flexeril to relieve her neck and back pain. (*Id*. at 44-45). These medications, according to Plaintiff, sometimes make her dizzy and drowsy. (*Id*. at 45).

---

[2] Dr. Feurdean also treated Plaintiff for mastitis of the left breast, hypertension, anemia, erythema, and induration. (*See* R. at 264-269).

2.     Plaintiff's Obesity

Plaintiff is obese: In May 2010, she was 5'4" tall and weighed 226 pounds. (*Id.* at 223). At the time of the hearing in November 2011, Plaintiff was the same height and weighed 225 pounds. (*Id.* at 38).

3.     Plaintiff's Knee Pain

In May 2010, Dr. Vekhnis noted that Plaintiff had once sprained her left knee, but did not indicate when she did so. (*Id.* at 223). Dr. Vekhnis observed that Plaintiff's left knee was tender anteriorly, but appeared stable with a full range of motion and normal muscle strength. (*Id.* at 224).

4.     Plaintiff's Anemia

In May 2010, Dr. Vekhnis noted that Plaintiff had anemia. (*Id.* at 223). Likewise, in her September 2011 physical RFC questionnaire, Dr. Feurdean noted that she had diagnosed Plaintiff with anemia. (*Id.* at 250).

5.     Plaintiff's Depression

The record contains no official diagnosis of depression. However, in her August 2010 Function Report, Plaintiff stated that she suffers from depression and anxiety attacks and that she feels "worthless" because she is unable to care for herself. (*Id.* at 173-74). Further, Plaintiff stated that she does not handle stress well and is unable to pay attention for long periods of time. (*Id.* at 172-173). Plaintiff also reported that she follows instructions fairly well, but occasionally needs them to be repeated. (*Id.* at 172). Relatedly, Dr. Feurdean opined in her September 2011 physical RFC questionnaire that Plaintiff's pain "constantly" interfered with her attention and concentration. (*Id.* at 251).

At the November 2011 administrative hearing, Plaintiff testified that both her pain and medication affect her concentration. (*Id.* at 53). She also testified that her anxiety attacks, which she purportedly experiences approximately four times a week, affect her memory. (*Id.*). According to Plaintiff, her anxiety attacks last anywhere from fifteen minutes to multiple hours and cause her to cry "a lot" and to "ball up into a ball" on her bed or the floor. (*Id.* at 54). Additionally, Plaintiff testified that she went to therapy "years ago" but was never prescribed medication. (*Id.*). Lastly, Plaintiff testified that she was not receiving psychiatric treatment at the time of the hearing because she had been unable to find a doctor that would accept her health insurance. (*Id.*).

> 6.    Plaintiff's Hypertension

On May 23, 2011, Dr. Feurdean noted that Plaintiff's hypertension condition was under control. (*Id.* at 258). Dr. Feurdean's September 9, 2011 RFC report listed hypertension as one of Plaintiff's diagnoses and notes that Plaintiff is prescribed Diovan for hypertension. (*Id.* at 250). At the November 2011 hearing, Plaintiff noted that she takes Diovan daily for hypertension. (*Id.* at 45).

> C.    Procedural History

On July 8, 2009, Plaintiff filed an application for supplemental security income with the Social Security Administration, alleging disability beginning March 13, 2008.[3] (*Id.* at 146). The Administration denied Plaintiff's application and subsequent request for reconsideration. (*Id.* at 63-69). In response, Plaintiff requested an administrative hearing, which occurred before ALJ Wexler on November 28, 2011. (*Id.* at 33-62).

---

[3] Plaintiff later amended the onset date to July 8, 2009. (R. at 16).

On January 12, 2012, ALJ Wexler issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act from July 8, 2009 through the date of decision.[4] (*Id.* at 16-23). Plaintiff sought Appeals Council review. (*Id.* at 6-11). The Appeals Council denied Plaintiff's request on March 25, 2013, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-3). As a result, Plaintiff appealed to this Court on May 29, 2013. (Compl., ECF No. 1). This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

## II.    LEGAL STANDARD

### A.    The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Social Security Administration is authorized to pay supplemental security income to "disabled" persons. 42 U.S.C. § 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. §

---

[4] Supplemental security income benefits are not payable for any month prior to the month after the application for such benefits is filed. 20 C.F.R. § 416.335.

416.920(a)(4)(i).  If so, the claimant is not disabled and, thus, the process ends.  *Id.*  If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments.  20 C.F.R. § 416.920(a)(4)(ii).  Absent such impairment, the claimant is not disabled.  *Id.*  Conversely, if the claimant has such impairment, the ALJ proceeds to step three.  *Id.*  At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment.  20 C.F.R. § 416.920(a)(4)(iii).  If so, the claimant is disabled.  *Id.*  Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity [("RFC")]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process.  *Id.*

The claimant bears the burden of proof for steps one through four.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (citing *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).  "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]."  *Id.* (citing *Ramirez*, 372 F.3d at 551).

10

B.     The Standard of Review: "Substantial Evidence"[5]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

## III.     DISCUSSION

At step one, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since July 8, 2009, the amended onset date and the application date." (R. at 18). At step two, the ALJ found that Plaintiff's degenerative disc disease, obesity, and knee pain were severe impairments. (*Id.*). The ALJ also found that Plaintiff's alleged anemia, depression, and hypertension were not severe impairments. (*Id.*). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (*Id.*). At step four, the ALJ determined that Plaintiff had the following RFC:

> [Plaintiff] has the [RFC] to perform sedentary work . . . except she can occasionally lift ten pounds, sit for approximately six hours, stand/walk for approximately two hours in an eight hour day with

---

[5] Because the regulations governing supplemental security income—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

> normal breaks and a sit/stand option; can use a cane for
> ambulation, can never climb ramps, stairs, ladders, ropes or
> scaffolds and can never stoop, kneel, crouch and crawl. [Plaintiff]
> has no limitations in pushing and pulling and can occasionally
> balance. Additionally, [Plaintiff] can perform routine tasks
> involving no more than simple, one or two step instructions and
> can make simple work related decisions with few work place
> changes.

(*Id.* at 19). As Plaintiff was unable to perform her past relevant work as a cook, server, or

bartender, the ALJ continued on to step five. (*Id.* at 22). At step five, the ALJ found that there

were jobs existing in significant numbers in the national economy that Plaintiff could perform.

(*Id.*). Thus, the ALJ concluded that Plaintiff was not disabled. (*Id.* at 23). Plaintiff contends

that this Court should reverse or alternatively remand the ALJ's decision because the ALJ erred

at steps four and five. (*See* Pl.'s Br. 5, ECF No. 20). The Court addresses each of Plaintiff's

arguments in turn.

    A.    <u>Whether the ALJ Erred at Step Four in Giving Lesser Weight to a Treating</u>
<u>Physician's Opinion</u>

Plaintiff contends that, in making her RFC determination at step four, the ALJ erred in

giving "lesser weight" to the findings and opinions of Plaintiff's treating physician, Dr.

Feurdean. (*Id.* at 17-20). Generally, an ALJ should give greater weight to the findings and

opinions of treating physicians than to those of consultant physicians. *Adorno v. Shalala*, 40

F.3d 43, 47 (3d Cir. 1994); *see also* 20 C.F.R. § 416.927(c)(2) ("[The Administration] give[s]

more weight to opinions from [a claimant's] treating sources, since these sources are likely . . .

most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) . .

. ."). "An ALJ may reject a treating physician's opinion outright only on the basis of

contradictory medical evidence . . . ." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)

(citation omitted). Such a rejection must be accompanied by an adequate rationale "so that the

reviewing court can determine whether the administrative decision is based on substantial evidence." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). An ALJ may not reject medical evidence for a "wrong reason," *Id.* (citation omitted), *e.g.*, a flawed interpretation of that evidence. *See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981) ("Because the evidentiary basis for his decision was not what he believed it to be, the ALJ's rejection of plaintiff's assertions of disabling pain was unsound.").

Here, Plaintiff's treating physician, Dr. Feurdean, diagnosed Plaintiff with herniated discs, hypertension, and anemia in a September 2011 physical RFC questionnaire. (R. at 250). Dr. Feurdean opined therein that Plaintiff could: never lift and/or carry ten pounds or less; stand and/or walk for less than two hours in an eight-hour workday; stand for ten minutes at a time before needing to sit down; and sit for ten minutes at a time before needing to get up. (*Id.* at 251-52). The ALJ gave "lesser weight" to these opinions on the basis that they were "generally inconsistent with [Dr. Feurdean's] progress notes." (*Id.* at 21). In support, the ALJ referred *only* to Dr. Feurdean's September 22, 2011 progress note, in which she reported that Plaintiff's symptoms were "much improved," and her October 6, 2011 progress note, in which she reported that Plaintiff had "no complains[sic]." (*Id.* at 21, 267, 269). Plaintiff argues that the ALJ's reliance on these two treatment notes was improper because she misconstrued them. (Pl.'s Br. 17-20). The Court agrees.

When Dr. Feurdean noted on September 22, 2011 that Plaintiff's symptoms were "much improved," she was referring to Plaintiff's left breast mastitis. (R. at 267). Plaintiff's course of treatment before this date confirms this fact. On September 16, 2011, Plaintiff had an "acute visit" with Dr. Feurdean, Plaintiff's chief complaint being breast pain. (*Id.* at 264). When Plaintiff again visited Dr. Feurdean's clinic on September 20, 2011, Dr. Feurdean prescribed

13

Plaintiff Keflex, an antibiotic, for her breast infection. (*Id.*). At that visit, Dr. Feurdean noted that Plaintiff then had erythema, but no skin break or nipple discharge. (*Id.*). On September 22, 2011, when Dr. Feurdean noted that Plaintiff's symptoms were "much improved," she also noted immediately above that Plaintiff had left breast mastitis and immediately below that Plaintiff had decreased swelling, redness, and tenderness. (*Id.* at 267). In her October 6, 2011 progress note, Dr. Feurdean indicated that Plaintiff's visit was a follow-up for Plaintiff's left breast mastitis. (*Id.* at 269). Dr. Feurdean reported therein that Plaintiff had no fever, chills, or nipple discharge. (*Id.*). It was in this context that Dr. Feurdean reported that Plaintiff then had "no complains[sic]." (*Id.*).

Hence, the context of Dr. Feurdean's treatment notes makes it clear that the "improved symptoms" applied to Plaintiff's left breast mastitis and that Plaintiff later had "no complains[sic]" with regard to that particular condition. (*Id.* at 264-269). Indeed, those notes pertain almost exclusively to Plaintiff's left breast mastitis, mentioning Plaintiff's lower back pain on a more general basis. (*See id.*). As such, the Court concludes that the ALJ erred when she gave "lesser weight" to Dr. Feurdean's findings on the basis that Dr. Feurdean's assessment of Plaintiff was generally inconsistent with her treatment notes. *See Wallace v. Sec. of Health & Human Servs.*, 722 F.2d 1150, 1155 (3d Cir. 1983) (per curiam) (remanding ALJ's decision because the ALJ either misread or rejected without explanation a medical report, among other problems); *see also Ritzer v. Colvin*, No. 13-1036, 2014 WL 1785346, at *5 (W.D. Pa. May 5, 2014) (remanding ALJ's decision on the basis that, in discrediting treating physician's assessment of plaintiff, ALJ misconstrued treating physician's comment that plaintiff showed improvement with treatment).

B.   Whether the ALJ Erred at Step Five in Finding That Significant Jobs Exist In the National Economy for Plaintiff

Plaintiff contends that the ALJ erred at step five by concluding that there were jobs existing in significant numbers in the national economy that she could perform.  (Pl.'s Br. 20). The Court declines to address Plaintiff's contention at this time in light of the potential ripple effect of the Court's above holding.  As discussed above, the ALJ misconstrued Dr. Feurdean's treatment notes and that misconstruction was the foundation of her decision to grant "lesser weight" to Dr. Feurdean's findings, including those related to Plaintiff's exertional limitations.  It cannot be said that the ALJ's error was without consequences.

While the ALJ gave "lesser weight" to Dr. Feurdean's findings in determining Plaintiff's RFC, she gave "greater weight" to the findings of Dr. Paolino, a consultant.  (R. at 22, 227-34). Dr. Paolino opined in June 2010 that Plaintiff could:  occasionally lift and/or carry ten pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; and sit (with normal breaks) for a total of about six hours in an eight-hour workday.  (*Id.* at 228). Dr. Paolino's opinion as to Plaintiff's exertional limitations contrast with those of Dr. Feurdean, who opined that Plaintiff could:  never lift and carry less than ten pounds; stand for ten minutes at a time before needing to sit; stand and/or walk for less than two hours total in an eight-hour workday; and sit for ten minutes at a time before needing to stand.  (*Id.* at 251-252).  Both the ALJ's RFC determination at step four and her hypothetical question to the vocational expert at the administrative hearing mirrored Dr. Paolino's opinion.  (*See id.* at 19, 57-58, 228).  Should the ALJ grant Dr. Feurdean's findings "greater weight" on remand, she may make an entirely different RFC determination that does not mirror Dr. Paolino's opinion, mirroring instead Dr. Feurdean's opinion, and thus ask an entirely different hypothetical question to the vocational expert.  As such, the Court declines to address whether the ALJ's step five determination was in

15

error at this time. *Cf. Baker v. Colvin*, No. 12-7251, 2014 WL 2652938, at \*11 n.9 (D.N.J. June 13, 2014) (declining to wade into plaintiff's argument that ALJ erred at step five where ALJ's step five determination was based on a flawed RFC determination); *Deitz v. Astrue*, No. 06-5053, 2008 WL 577000, at \*11 (D.N.J. Feb. 29, 2008) (remanding where ALJ's hypothetical question to VE failed to reflect all of Plaintiff's medically supported limitations).

## IV.   CONCLUSION

The Court has reviewed the entire record and, for the reasons discussed above, finds that the ALJ's RFC finding and consequent determination that Plaintiff was not disabled were not supported by substantial evidence. Accordingly, the Court will vacate the ALJ's decision and remand for further proceedings. An appropriate order accompanies this opinion.

DATED: July 22, 2014

_____
JOSE L. LINARES
U.S. DISTRICT JUDGE